FILED
U.S. DISTRICT COURT
DISTRICT OF MARYLAND

2015 JAN 21

CLERK'S OFFICE
AT BALTIMORE

BY_____DEPUTY

SRD2014R00527

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA :
: Criminal No. GLR-15-029
v. :
: (Mail Fraud, 18 U.S.C. § 1341;
JASPER BUCK : Forfeiture, 18 U.S.C. § 981(a)(1)(C))
:
**Defendant.** :
:
:

...oOo...

## INDICTMENT

### COUNTS ONE THROUGH FIVE
(Mail Fraud)

The Grand Jury for the District of Maryland charges that:

At all times relevant to this Indictment:

1. Defendant **JASPER BUCK** ("**BUCK**") resided in Westminster, Maryland and elsewhere, including Sanford and Lake Mary, Florida. **BUCK** worked for mortgage companies, but held himself out to investor/victims as an experienced investment advisor.

2. Portfolio Financial Group LTD ("PFG") was the name on bank accounts listing **BUCK** and his wife as signatories, and its addresses were listed, at various times, as either **BUCK's** personal residence or shipping and packaging stores such as The United Parcel Service ("UPS") Store.

3. PFG was formerly incorporated in Maryland by **BUCK** in 2002 with the stated purpose of "the sale and servicing of several financial products." Maryland forfeited the entity in 2004 for failure to file a property return.

4. **BUCK** also on occasion used the name of Prestige Partners Group, an entity incorporated in Maryland by **BUCK** in 2008, and forfeited in 2010 for failure to file a property return.

5.  Equity Trust Company ("ETC") was a self-directed Individual Retirement Account ("IRA") and 401(k) plan custodian located in Elyria and Westlake, Ohio.  As a self-directed IRA custodian, ETC was authorized to receive rollovers directly from an investor's prior IRA or 401(k) without the investor incurring tax obligations.  After receiving a promissory note executed by the individual or company with whom an investor chose to invest, ETC would then disburse the investor's funds according to directions provided on a Direction of Investment ("DOI") form signed by the investor.  Once ETC disbursed investor funds, the only asset held by ETC was the executed promissory note.

## THE SCHEME AND ARTIFICE TO DEFRAUD

6.  From in or about October 2006 through at least December 2014, in the District of Maryland and elsewhere, the defendant

## JASPER BUCK

did knowingly and willfully devise and intend to devise a scheme and artifice to defraud and to obtain money and property from his investor/victims, by means of materially false and fraudulent pretenses, representations, and promises.

## MANNER AND MEANS

7.  It was part of the scheme and artifice to defraud that **BUCK** told his investor/victims that he was a representative of PFG and that PFG had owners and employees other than **BUCK**, when, in truth and fact, there were no other owners and employees of PFG. **BUCK** further stated that PFG would loan the monies provided by investor/victims to borrowers who needed funds quickly or were unable to obtain traditional bank loans and were therefore willing to pay a higher interest rate on the loans, when, in truth and fact, there were no such borrowers.

8. It was further part of the scheme and artifice to defraud that **BUCK** convinced some investor/victims to refinance the mortgages on their homes and use lines of credits in order to invest the proceeds with **BUCK** through PFG. **BUCK** told those investor/victims that by investing the proceeds with PFG, they would receive a monthly return on their investment greater than the investor/victim's monthly loan payments.

9. It was further part of the scheme and artifice to defraud that **BUCK** convinced some investor/victims to invest all or a portion of their retirement savings with **BUCK** through PFG. Some of these investments were made from loans taken out of the investor/victim's IRA or 401(k). **BUCK** told investor/victims that they would receive a return higher than the principal and interest payments due on those loans.

10. It was further part of the scheme and artifice to defraud that **BUCK** convinced some investor/victims to move their retirement savings into a self-directed IRA account with ETC. **BUCK** subsequently directed those investor/victims to authorize a transfer of those funds from ETC to **BUCK**, for the purported purpose of **BUCK** investing those funds through PFG.

11. It was further part of the scheme and artifice to defraud that **BUCK** signed promissory notes with some investor/victims containing promised monthly interest payments. However, **BUCK** was not required by the terms of those notes to pay the investor/victims back the full amount of principal until at least fifteen years or as much as thirty years later.

12. It was further part of the scheme and artifice to defraud that **BUCK** allowed his investor/victims to be lulled into believing that their principal was safe and investments were sound by relying on ETC quarterly statements sent to investor/victims that listed as "asset value" only the total amount of the transfers made pursuant to the promissory notes, and contained no information on **BUCK's** lack of investment activity after the transfers.

13. It was further part of the scheme and artifice to defraud that, in order to convince investor/victims to invest with him, **BUCK** gave some investor/victims documents comparing the investors' current financial state to **BUCK**'s promised rates of return.

14. It was further part of the scheme and artifice to defraud that **BUCK**, upon receipt of investor/victim funds, did not loan those funds to borrowers who needed funds quickly or were unable to obtain traditional bank loans and were therefore willing to pay a higher interest rate on the loans.

15. It was further part of the scheme and artifice to defraud that **BUCK**, contrary to representations made to investor/victims, used the investor/victim monies for his own personal use and benefit.

16. It was further part of the scheme and artifice to defraud that **BUCK** issued or caused to be issued payments to some investor/victims, using funds from other investor/victims, for the purpose of convincing those investor/victims that their investments were earning the expected returns.

17. It was further part of the scheme and artifice to defraud that **BUCK** made numerous telephone calls and sent numerous text messages and emails to investor/victims making false statements regarding the purported investments, for the purpose of lulling the investor/victims into believing that their loan principal was safe and that their purported investments were sound.

18. It was further part of the scheme and artifice to defraud that **BUCK** made additional false representations to investor/victims regarding PFG in order to explain why **BUCK** could not comply with specific investor/victim requests to return funds, including a representation to an investor/victim that **BUCK** needed approval from "Doug," **BUCK's**

purported boss at PFG, in order to release that investor/victim's funds, when, in truth and fact, there was no such individual.

19. It was further part of the scheme and artifice to defraud that, beginning in or about January 2014, when **BUCK** had exhausted all of the funds in his PFG account and could no longer make any payments to investor/victims, **BUCK** made additional false representations, via emails, text messages, and telephone calls, for the purpose of concealing his scheme to defraud, including but not limited to: a) "there is no issue with Portfolio financially, in any way whatsoever;" b) PFG was in the process of "updating software for their entire organization;" c) PFG was slowed by "new Federal Regulations;" d) investor/victim money was still in the possession of PFG, but **BUCK** was unable to physically access it; e) PFG was in the process of selling its assets to another company that was located in California and that, until that sale was complete, the assets could not be released; f) PFG "is technically in default on our contracts that we hold with them;" and g) **BUCK** was pursuing legal action against PFG.

20. As a result of the scheme and artifice to defraud, **BUCK** obtained at least $1,961,364 from investor/victims.

21. On or about the dates listed below, in the District of Maryland and elsewhere, the defendant

**JASPER BUCK**

having knowingly and willfully devised and intending to devise the above-described scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing and attempting to execute such scheme and artifice to defraud, did knowingly cause to be placed in any post office and other authorized depository for mail matter, any matter and thing to be sent and delivered by the Postal Service, and did cause to be deposited any matter or thing to be sent and delivered by

any private and commercial interstate carrier, and did knowingly cause to be delivered by mail and by any private and commercial interstate carrier any matter and thing, according to the direction thereon, the following matters as set forth below:

| COUNT | INVESTOR/VICTIM | DATE | DESCRIPTION |
|---|---|---|---|
| One | Investor/Victim #1 | August 15, 2011 | Envelope containing a $98,600 check made payable to PFG deposited with United States Postal Service ("USPS") in the District of Maryland and delivered to PFG, Jasper Buck in Lake Mary, Florida. |
| Two | Investor/Victim #2 | December 31, 2011 | Envelope containing ETC Quarterly Statement dated 10/1/2011 – 12/31/2011 for Investor/Victim #2 deposited with USPS in Ohio and delivered to Investor/Victim #2 in the District of Maryland. |
| Three | Investor/Victim #3 | December 4, 2012 | Envelope containing three checks totaling $10,399.81 made payable to PFG deposited with USPS in the District of Maryland and delivered to Jasper Buck, Lake Mary, Florida. |
| Four | Investor/Victim #4 | September 30, 2013 | Envelope containing ETC Quarterly Statement dated 7/1/2013 – 9/30/2013 for Investor/Victim #4 deposited with USPS in Ohio and delivered to Investor/Victim #4 in the District of Maryland |
| Five | Investor/Victim #5 | October 21, 2013 | Envelope containing three checks totaling $29,012.49 made payable to PFG deposited with UPS in the District of Maryland and delivered to Prestige Partners Group, Lake Mary, Florida. |

18 U.S.C. § 1341

## FORFEITURE

1. Pursuant to Rule 32.2, Fed. R. Crim. P., notice is hereby given to the defendant that the United States will seek forfeiture as part of any sentence in accordance with Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), in the event of the defendant's conviction under Counts One through Five of the Indictment.

2. As a result of the offenses set forth in Counts One through Five, the defendant

**JASPER BUCK**

shall forfeit to the United States all property, real or personal, which constitutes or is derived from proceeds traceable to the scheme to defraud.

3. The property to be forfeited includes, but is not limited to, a sum of money equal to the proceeds of the scheme to defraud, which amount is at least $1,961,364.

4. If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

   a. cannot be located upon the exercise of due diligence

   b. has been transferred, sold to, or deposited with a third party

   c. has been placed beyond the jurisdiction of the court;

   d. has been substantially diminished in value; or

   e. has been commingled with other property which cannot be divided without difficulty,

it is the intent of the United States, pursuant to 21 U.S.C. § 853(p), as incorporated by 28 U.S.C. § 2461(c), to seek forfeiture of any other substitute property of the defendant's up to the value of the forfeitable property described above.

18 U.S.C. § 981(a)(1)(c)
18 U.S.C. § 1956(c)(7)
18 U.S.C. § 1961(1)

28 U.S.C. § 2461(c)
Fed. R. Crim. P. 32.2(a)

_____
Rod J. Rosenstein
United States Attorney

A TRUE BILL:

**SIGNATURE REDACTED  REDACTED**

Date  1/21/15